**U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO.: 1:24-cr-556 |
| v. | JUDGE: TREVOR N. MCFADDEN |
| DERRICK THOMAS MARTIN | |

**DEFENDANT'S MOTION TO EXCLUDE DRUG TRAFFICKING EXPERT**

Mr. Derrick Martin, through undersigned counsel, pursuant to Federal Rule of Criminal Procedure 16, the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), respectfully moves this Honorable Court to exclude testimony from the government's proffered "expert in the field of drug trafficking and distribution" at Mr. Martin's trial scheduled for May 26, 2025. At a minimum, Mr. Martin requests that the Court hold a *Daubert* hearing in advance of trial to determine the admissibility and scope of the proffered testimony. In support of this Motion, counsel submits the following.

**Factual Background**

Mr. Martin is charged in a four-count Superseding Indictment, ECF 19, with offenses arising out the search of the apartment of his daughter's mother on November 25, 2024. Specifically, Mr. Martin is charged with unlawful possession of a firearm by a person convicted with prior felony (Count I), possession with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of a fentanyl analogue (Count II), unlawful possession with intent to distribute 500 grams or more of a mixture of substance containing a detectable amount of cocaine; and (4) using, carrying, and possessing a firearm during a drug trafficking activity (Count IV).

1

1.  **Anticipated Government Evidence**

At the trial, the government will present evidence that law enforcement officers went to the apartment to serve an arrest warrant on Mr. Martin, that an officer observed Mr. Martin throw a backpack out a window, and that the police recovered the alleged narcotics and firearm from the backpack. The government may also seek to present evidence of items recovered from the apartment, including a second firearm, a scale, US currency, a money counter, and certain narcotics and narcotics paraphernalia. In addition, the government has filed a motion to introduce evidence of other crimes pursuant to Federal Rule of Criminal Procedure 404(b) and 609. Mr. Martin is only charged with the items – firearm (Draco) and alleged narcotics – found within the backpack. He is not criminally charged with any of the items recovered in the apartment or any of the alleged 404(b) or 609 evidence.

At trial, the government will seek the prove the identify of Mr. Martin as the person who possessed the fentanyl, cocaine, and firearm (Draco) and will seek to prove that the alleged narcotics were possessed with the intent to distribute and not for personal use.

**Expert Notice**

On April 4, 2025, the government provided the defense with notice of intent to introduce testimony from Detective James Walsh of the Montgomery County Department of Police Special Investigations Division as an expert in the field of drug trafficking and distribution. See ECF 27 & 27-2. The notice first lists four very broad "opinions" that Detective Walsh "will offer," but are not sufficiently narrow to provide adequate notice of any testimony relevant to this case. These are:

- The methods of using and purchasing narcotics in the metropolitan District of Columbia area, including but not limited to, the reasons for such methods; the cost (price) of narcotics, both wholesale and retail; the common dosage of, usable and measurable amounts, and

2

strength of narcotics; packaging materials, cutting agents, scales, and paraphernalia for using drugs; and methods used to avoid detection of narcotics by law enforcement.

- The methods for processing, packaging, selling, transferring, and trafficking narcotics in the metropolitan District of Columbia area, including but not limited to the roles of different participants in drug trafficking schemes.

- The manner in which the narcotics sold on the street level of the metropolitan District of Columbia area are commonly packaged and sold based on the narcotic.

- The paraphernalia that users commonly possess to ingest drugs and that the lack of paraphernalia in this case is consistent with distribution, not use.

*See* ECF 27-2 at 1-2. Those "opinions" are not sufficient notice of the proposed testimony in this case because they are overly broad and include a large volume of information that is not relevant to the charges here. All methods of processing, packaging, selling, etc.—and the paraphernalia associated with—all narcotics in the District of Columbia area is not relevant to the charges here.

The government's notice, however, follows those very broad "opinions" with a proffer of testimony "[r]egarding the specific facts of this case." Only this specific proffer should be considered for potential admission at Mr. Martin's trial, but as discussed below, even the specific proffered opinions should be excluded. The specific noticed opinions are:

- "Blue," "blues" "30s" or "M30s" are common street names in the D.C. metropolitan area area for synthetic opioid pills.

- Synthetic opioids such as "blues" are often prepared and distributed in pill form and stamped with the letter "M" on one side and the number "30" on the other.

- Carfentanil is a fentanyl analogue and is a Schedule II controlled substance.

- Cocaine Hydrochloride is a Schedule II controlled substance.

- It is common for drug traffickers to find, market, and sell

3

analogues or similar synthetics that can serve as a substitute for a specific controlled substance.

- He has investigated other recent drug trafficking cases in the metropolitan District of Columbia area in which defendants refer to the trafficking of "blues" in conversations and those defendants are later arrested and found to be in possession of fentanyl or its analogues, as reflected by the evidence in this case.

- Based on a review of Defendant Martin's text messages, Defendant Martin appears to be engaged in the production, marketing and distribution of narcotics. Specifically, there are hundreds of messages in Martin's phone reflecting the following:

    - Discussions about the price, quantity, and sale of narcotics, including fentanyl and cocaine, between Defendant Martin and purchasers or other distributors of narcotics, including what appear to be negotiations and consummated sales;

    - Discussions between Defendant Martin and an unidentified individual in which Defendant Martin discusses the purchase of a pill press, M30 pill press molds, and how to mix ingredients to create pills successfully;

    - Discussions in which Defendant Martin discusses how to cut and mix cocaine; and

    - Discussions regarding the transfer of large quantities of narcotics by mail.

- Separately, the DEA intercepted a pill press which appears to have been intended for delivery to Defendant Martin. This is corroborated by text messages in which Martin appears to be attempting to acquire the pill press as well as communications in which he appears to attempt to locate the press when it was not delivered as expected. An individual with the understanding and ability to acquire a pill press and to understand how to use it is clearly distributing narcotics and not possessing them for personal use.

- Additionally, the DEA intercepted two separate parcels containing kilogram quantities of fentanyl and cocaine that appear to be intended for Defendant Martin. This quantity is exponentially larger than what would be expected for a drug

user.

- The 5,765 tablets of Carfentanil recovered from Defendant Martin's backpack is more consistent with distribution than personal use.

- The manner in which the 5,765 tablets of Carfentanil recovered were packaged is more consistent with distribution than personal use. That is, it was packaged for sale and not for personal use.

- The 636.9 grams of Cocaine Hydrochloride recovered from Derrick Martin's backpack is more consistent with distribution than personal use.

- The manner in which the 636.9 grams of Cocaine Hydrochloride recovered from Derrick Martin's apartment were packages is more consistent with distribution than personal use. That is, it was packages for sale and not for personal use.

- The $12,133 in assorted denominations recovered from Defendant Martin's apartment is suggestive of drug distribution.

- The black electronic scale recovered from Defendant Martin's apartment is suggestive of distribution

- The money counter recovered from Defendant Martin's apartment is suggestive of distribution.

- Overall, the quantity of narcotics, the way they were packaged, the currency and scale recovered, taken together with Defendant Martin's text messages — including his efforts to acquire a pill press — indicates that Defendant Martin distributed narcotics, specifically "Blues."

- Defendant Martin's possession of a firearm is common among drug traffickers. Firearms are used by drug traffickers to ensure that they are not the targets of robberies or assaults (which are common), to protect themselves, their narcotics, and proceeds, and to maintain control over the areas in which they distribute narcotics. This is particularly the case given the significant quantities of different narcotics and cash that Martin regularly possessed.

- Notably, there is at least one image of Martin in possession of the firearm with narcotics and cash displayed alongside, if not, on top of it. And the firearm here was recovered in the same

5

backpack as significant quantities of fentanyl and cocaine.

- It is not uncommon for drug distributors to distribute different controlled substances at different times. Changes in consumer demand and available supply often dictate what a distributor is able to sell at a specific time, rather than a distributor's personal predilections.

*See* ECF27-2 at 3-4.

## **Applicable Law**

Federal Rule of Criminal Procedure 16 requires the government to disclose a written notice of any expert testimony it intends to present at trial. The notice must include:

- a complete statement of all opinions that the government will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defendant has timely disclosed under (b)(1)(C);

- the bases and reasons for them;

- the witness's qualifications, including a list of all publications authored in the previous 10 years; and

- a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

Fed. R. Crim. P. 16(a)(1)(G)(iii). In addition, "[t]he witness must approve and sign the disclosure[.]" *Id.* at (a)(1)(G)(v).

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

6

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods of the facts of the case.

Federal courts have a special gate-keeping obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This "gatekeeping" requirement is intended to ensure that the expert, whether basing his or her testimony on professional studies or personal experience, employs the same level of intellectual rigor as an expert practicing in that field. *Kumho*, 526 U.S. at 152. It is the role of the district court as a "gatekeeper" to determine if the expert opinion is reliable and relevant to the case at hand. *Id.* at 141; *Daubert,* 509 U.S. at 597. In the case of a challenge, the district court should evaluate an expert's qualifications and proposed testimony in advance of trial. *Id.* The proponent of the expert testimony bears the burden of proving that it is based on reliable principles and methods. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1120 (10th Cir. 2006).

Under Rule 702, "[t]he subject of an expert's testimony must be 'scientific knowledge.'" *Daubert,* 509 U.S. at 589-90. As the Supreme Court explained, "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science[,]" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* at 590. Evaluating the reliability of a prospective expert's scientific testimony requires a preliminary evaluation of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592. In turn, *Daubert* sets forth a list of factors for courts to consider when assessing the reliability of scientific expert testimony:

(1)　　whether the expert's theory or technique can be or has been empirically tested;

(2)      whether the theory or technique has been subjected to peer review and publication;

(3)      the known or potential rate of error of a particular scientific technique;

(4)      the existence and maintenance of standards controlling the technique's operation; and

(5)      whether the theory or methodology is generally accepted in the relevant scientific community.

*Id*. at 592-94. These factors are not exhaustive. *Kumho*, 526 U.S. at 141-42.

Proper application of *Daubert* ensures that jurors, who are likely to give great weight to expert testimony, will not be "confounded by absurd and irrational pseudoscientific assertions." *Daubert*, 509 U.S. at 595. The district court has discretion to "close the courtroom door to 'junk science[.]'" *Robinson v. GEICO General Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). The Supreme Court observed that a technique which only has minimal support in the relevant community may be viewed with skepticism. *Id.* at 594. The trial court must conduct an exacting analysis of the foundations of an expert opinion to ensure they meet the requirements for admissibility under Rule 702. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd*., 326 F. 3d 1333, 1341 (11th Cir. 2003); *McCorvey v. Baxter Healthcare Corp*., 298 F.3d 1253, 1257 (11th Cir. 2002).

In assessing whether testimony will assist the trier of fact, district courts consider several factors, including "(1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility. In essence, the question is 'whether [the] reasoning or methodology properly can be applied to the facts in issue.'" *Rodriguez-Felix*, 450 F.3d at 1123.

8

A district court should exclude the opinion testimony of an expert witness if it is not relevant. Fed. R. Evid. 401, 402, and 702; *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 260 (4th Cir. 1999); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir. 1997); *see Daubert,* 509 U.S. at 592-93. The probative value of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See* Fed. R. Evid. 403. Testimony should be excluded when the evidence supporting the expert's opinion is insufficient to allow a reasonable juror to conclude that the proposition is more likely to be true than false. *Pipitone v. Biomatrix*, Inc., 288 F.3d 293, 245 (5th Cir. 2002); *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 972 (6th Cir. 1994).

"To be helpful, expert testimony must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *United States v. Delgado*, 677 F. App'x 84 (3d. Cir. 2017) (quoting *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010)). Conversely, "expert evidence which does not relate to an issue in the case is not helpful." *Id.* (quoting *United States v. Ford*, 481 F.3d 215, 219 n.6 (3d Cir. 2007)). "The 'standard is not that high,' but 'is higher than bare relevance.'" *Schiff*, 602 F.3d at 173. Trial courts are "caution[ed]" to "tread carefully when evaluating proffered expert testimony," as "scientific expert testimony carries special dangers to the fact-finding process because it can be both powerful and quite misleading because of the difficulty in evaluating it." *Delgado*, 677 F. App'x at 68 (quoting *Ford*, 481 F.3d at 219 n.6).

<u>**Argument**</u>

**1.  Experts Cannot Testify to Ultimate Issues**

The Court should conclude that based on the notice provided, Detective Walsh would be improperly testifying to an ultimate issue. The government states it expects Detective Walsh to testify to the following:

- Carfentanil *is* a fentanyl analogue and is a Schedule II controlled substance.

- Cocaine Hydrochloride *is* a Schedule II controlled substance.

- Defendant Martin appears to be *engaged in the production, marketing and distribution of narcotics*.

- An individual with the understanding and ability to acquire a pill press and to understand how to use it is *clearly* distributing narcotics and not possessing them for personal use.

- The $12,133 in assorted denominations recovered from Defendant Martin's apartment is *suggestive of drug distribution*.

- The black electronic scale recovered from Defendant Martin's apartment is *suggestive of distribution*.

- The money counter recovered from Defendant Martin's apartment is *suggestive of distribution*.

- Overall, the quantity of narcotics, the way they were packaged, the currency and scale recovered, taken together with Defendant Martin's text messages — including his efforts to acquire a pill press — indicates that *Defendant Martin distributed narcotics*, specifically "Blues."

Attachment 1 at 2-3 (emphasis added)

Whether Mr. Martin possessed the substances recovered with the intent to distribute them are the ultimate issues for the jury to determine. That the language in the notice does not use the specific language of the indictment, jury instructions, or statute is not enough to cure his proposed opinions. Although an expert witness may under some circumstances testify to common criminal practices, the opinions in Detective Walsh's notice go beyond such general assertions. *See United States v. Smart*, 98 F.3d 1379, 1388 (D.C. Cir. 1996). Detective Walsh's opinion that the facts

show that Mr. Martin was in fact distributing narcotics is not admissible. *See id.* (Rule 704(b) violated when expert analyzed a substantially similar hypothetical and stated it "met the elements" of the crime charged); *United States v. Mitchell*, 996 F.2d 419, 421-22 (D.C. Cir. 1992) (admission of testimony that packaging of drugs meant person possessing the drugs had intent to distribute was erroneous); *cf. United States v. Clarke*, 24 F.3d 257, 269 (D.C. Cir. 1994) (testimony of expert did not violate rule because expert testimony regarding roles within illegal drug trafficking network did not amount to opinion as to defendant's guilt).

### 2. Proffered Testimony is Not Beyond the Ken of the Average Juror

Some of the "opinions" that the government has proffered consists only of historical facts and others are government arguments based on the facts at issue here, which are not beyond what the average jury is capable of understanding. "Testimony is properly characterized as 'expert' *only if* it concerns matters that the average juror is not capable of understanding on his or her own." *See United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008) (emphasis added) (citing *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)). A purported expert must use a reliable methodology to form his own opinions in a manner that an ordinary juror cannot. *Gilmore v. Palestinian Interim Self-Government*, 843 F.3d 958, 972 (D.C. Cir. 2016). "'[W]here the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose.'" *Id.* at 973 (quoting *Henkel v. Varner*, 138 F.2d 934, 935 (D.C. Cir. 1943)). The requirement that expert testimony address matters that the average juror is not capable of understanding cannot be met simply by demonstrating that the average juror does not know the facts the expert seeks to present. Fact testimony must be presented through fact witnesses.

While an expert may rely on hearsay or otherwise inadmissible evidence to form opinions and may testify to those underlying facts pursuant to Federal Rule of Evidence 703, expert testimony cannot be used as means of circumventing the Rules of Evidence regarding hearsay. As the Second Circuit has explained and the D.C. Circuit has held:

> The expert may not, however, simply transmit that hearsay to the jury. [*United States v. Dukagjini*], 326 F.3d [45, 54 (2d Cir. 2003] ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded."). Instead, the expert must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials. *Id*. at 58. Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the Government "to circumvent the rules prohibiting hearsay." *Id*. at 58–59.

*Mejia*, 545 F.3d at 197, *quoted in Gilmore*, 843 F.3d at 972; *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) (expert must be "true expert whose considered opinion sheds light on some specialized factual situation" rather than "conduit or transmitter for testimonial hearsay"); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 439 (E.D.N.Y. 2013) (same).

Here, the government seeks to introduce "expert" opinion testimony that:

- Based on a review of Defendant Martin's text messages, Defendant Martin appears to be engaged in the production, marketing and distribution of narcotics (although not the specific narcotics recovered and charged here). Specifically, there are hundreds of messages in Martin's phone reflecting the following:

    - Discussions about the price, quantity, and sale of narcotics, including fentanyl and cocaine, between Defendant Martin and purchasers or other distributors of narcotics, including what appear to be negotiations and consummated sales;

    - Discussions between Defendant Martin and an unidentified individual in which Defendant Martin discusses the purchase of a pill press, M30 pill press molds, and how to mix ingredients to create pills successfully;

12

- - Discussions in which Defendant Martin discusses how to cut and mix cocaine; and

  - Discussions regarding the transfer of large quantities of narcotics by mail.

- Separately, the DEA intercepted a pill press which appears to have been intended for delivery to Defendant Martin. This is corroborated by text messages in which Martin appears to be attempting to acquire the pill press as well as communications in which he appears to attempt to locate the press when it was not delivered as expected. An individual with the understanding and ability to acquire a pill press and to understand how to use it is clearly distributing narcotics and not possessing them for personal use.

- Additionally, the DEA intercepted two separate parcels containing kilogram quantities of fentanyl and cocaine that appear to be intended for Defendant Martin. This quantity is exponentially larger than what would be expected for a drug user.

- The 5,765 tablets of Carfentanil recovered from Defendant Martin's backpack is more consistent with distribution than personal use.

- The manner in which the 5,765 tablets of Carfentanil recovered were packaged is more consistent with distribution than personal use. That is, it was packaged for sale and not for personal use.

- The 636.9 grams of Cocaine Hydrochloride recovered from Derrick Martin's backpack is more consistent with distribution than personal use.

- The manner in which the 636.9 grams of Cocaine Hydrochloride recovered from Derrick Martin's apartment were packages is more consistent with distribution than personal use. That is, it was packages for sale and not for personal use.

- The $12,133 in assorted denominations recovered from Defendant Martin's apartment is suggestive of drug distribution.

- The black electronic scale recovered from Defendant Martin's apartment is suggestive of distribution

- The money counter recovered from Defendant Martin's

13

apartment is suggestive of distribution.

- Overall, the quantity of narcotics, the way they were packaged, the currency and scale recovered, taken together with Defendant Martin's text messages — including his efforts to acquire a pill press — indicates that Defendant Martin distributed narcotics.

- Defendant Martin's possession of a firearm is common among drug traffickers. Firearms are used by drug traffickers to ensure that they are not the targets of robberies or assaults (which are common), to protect themselves, their narcotics, and proceeds, and to maintain control over the areas in which they distribute narcotics. This is particularly the case given the significant quantities of different narcotics and cash that Martin regularly possessed.

- It is not uncommon for drug distributors to distribute different controlled substances at different times. Changes in consumer demand and available supply often dictate what a distributor is able to sell at a specific time, rather than a distributor's personal predilections.

These "opinions" are all either history facts or the government's argument regarding the inferences the jury should draw from the evidence presented. These are not complicated arguments or inferences. Any jury can look at the government's evidence, listen to counsel's arguments, and determine if the evidence establishes an intent to distribute on the charged dates. Adding the imprimatur of an expert to the government's argument is unnecessary and prejudicial. This is not a case in which the government has charged a drug trafficking conspiracy and an expert could assist the jury in understanding how a trafficking network operates. *See, e.g., Clarke*, 24 F.3d 257, 269 (D.C. Cir. 1994) (expert testimony about the operations of a typical drug network offered to put charged network in context). The only questions for the jury here are whether Mr. Martin possessed the alleged drugs and firearm inside the backpack and whether the drugs were possessed with the intent to distribute.

    **3.  Any Probative Value of the Proffered Testimony is Substantially Outweighed by the Prejudicial Effect**

14

The Court may exclude relevant evidence "if its probative value is substantially outweighed by danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.As the D.C. Circuit has recognized, "there is often an inherent danger with expert testimony unduly biasing the jury 'because of its aura of special reliability and trust.'" *United States v. Anderson*, 851 F.2d 384, 393 (D.C. Cir. 1988) (quotation omitted). Rule 403 "requires the trial court to undertake a subtle balancing to determine whether the probative value of the evidence outweighs its prejudicial effect[.]" *United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992). Here, where the evidence is not complicated, the prejudicial effect outweighs the value of the expert's opinions.

### 4.   Some of the Proffered Testimony has No Relevance to the Charged Offenses.

The government proffers that Detective Walsh will testify as to several opinions that have no direct relationship with the alleged drugs and firearm that are the subject of the criminal charges. Specifically, there is no evidence that any of the drugs recovered called "Blue," "blues," 30s" or "M30s." Any reference to Blues in any form is irrelevant. Additionally, any prior contact with alleged drug distribution is not relevant to the alleged narcotics recovered. Therefore, testimony about prior intercepted packages, prior distributions, pill press, money, and possession of other firearms is not relevant.

### 5.   Improper Opinion about State of Mind

The government is seeking to admit testimony from Detective Walsh that the possession was more consistent with distribution than personal use. Rule 704(b) bars an expert witness in a criminal case from stating "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Thus, an expert may not

15

"express[ ] an opinion on whether the particular charged defendant[ ] . . . had the requisite intent" to commit the charged crime. *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988). Only the jury can decide intent. *United States v. Smart*, 98 F.3d 1379, 1388 (D.C. Cir. 1996) (citing *United States v. Lipscomb,* 14 F.3d 1236, 1242-43 (7th Cir. 1994); *see also Smart*, 98 F.3d at 1388-89 (1996) (holding that mirroring hypotheticals that call for an opinion that implies the defendant's intent violate Rule 704(b)); *United States v. Miller*, 395 F.3d 452, 455 (D.C. Cir.), *cert. granted, judgment vacated on other grounds,* 545 U.S. 1101 (2005) (same).

Here, the government is seeking to admit expert testimony as to intent. This it may not do.

### Conclusion

For the foregoing reasons and such other reasons as may be presented at a hearing on this motion, Mr. Martin respectfully moves to exclude and limited the proposed testimony from Detective Walsh.

Respectfully submitted,

/s Edward J. Ungvarsky
Edward J. Ungvarsky, Bar No. 459034
Ungvarsky Law, PLLC
421 King Street, Suite 505
Alexandria, VA 22314
DC: 202 546 1500
VA: 571 207 9710
Cell: 202 409 2084
Email: ed@ungvarskylaw.com
Counsel for Derrick Martin

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion to Exclude was served on the government, via electronic filing, on this 17th day of April, 2025.

/s/ Edward J. Ungvarsky
Edward J. Ungvarsky

16